UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-10236-GAO

JOCELYN SANTIAGO,
Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,
Defendant.

OPINION AND ORDER
March 31, 2016

O'TOOLE, D.J.

The Commissioner of the Social Security Administration denied Jocelyn Santiago's application for a period of disability and disability insurance benefits. Before the Court are Santiago's Motion for Judgment on the Pleadings (dkt. no. 9) and the Commissioner's Motion to Affirm the Commissioner's Decision (dkt. no. 14).

## I. Procedural History

Santiago filed an application for Social Security disability benefits on January 6, 2012, claiming disability since March 2011. (Administrative Tr. 21 [hereinafter R.].)[1] Her application was initially denied on April 12, 2012 and denied upon reconsideration on June 15, 2012. (Id. at 117-22, 125-29.) Santiago requested a hearing, which was held before Administrative Law Judge ("ALJ") Daniel J. Driscoll on August 13, 2013. (R. at 41-80.) On September 19, 2013, the ALJ issued a decision concluding that Santiago was not disabled under the Social Security Act. (Id. at

---

[1] The administrative record has been filed electronically (dkt. no. 7). In its original paper form, its pages are numbered in the lower right-hand corner of each page. Citations to the record in this Opinion and Order are to the pages as originally numbered and not to the numbering supplied by the electronic docket.

18-40.) On October 17, 2013, Santiago requested review of the ALJ's decision by the Appeals Council. (Id. at 15-17.) However, on December 2, 2014, the Appeals Council denied her request for review, (Id. at 1-6.), rendering the ALJ's decision the final decision of the Commissioner and making the case ripe for review by this Court under 42 U.S.C. § 405(g).

**II.     Background**

Santiago was born in 1982. (Id. at 50.) She received an associate degree in business science. (Id. at 54.) During her schooling, she received various accommodations as a special education student. (Id. at 67-68.) Before the alleged onset of her disability, Santiago worked as a telephone operator performing customer service, hand packager, and cashier. (Id. at 55-62, 73-76.) She claims she suffers from various physical and mental impairments that limit her ability to work.

A.     Relevant Medical History

i.     *Holy Family Hospital*

On August 10, 2011, Santiago was evaluated in the emergency room at Holy Family Hospital for chest pain which she reported had worsened over a period of months. (Id. at 597.) Santiago complained of shortness of breath, dizziness, nausea, and headache, and reported a history of migraines, diabetes, polycystic ovarian syndrome, hyperlipidemia, asthma, and a cholecystectomy. (Id. at 597, 599, 601.) The examiner formed a clinical impression that Santiago's chest pain was associated with anxiety and palpitations. (Id. at 602.) Santiago was prescribed Ativan (an anti-anxiety medication) at discharge. (Id. at 610.)

ii.     *William W. Austin and Roy E. Arroyo*

On March 28, 2012, Santiago was evaluated by William W. Austin, Psy.D., and Roy E. Arroyo, Psy.D., at the request of the Social Security Administration. (Id. at 726.) Santiago reported being diagnosed with major depressive order at age 11 and again approximately six months prior

to the examination. (Id. at 726.) She described symptoms of frustration, sadness, irritability, concentration problems, economic and health worries, sadness, interpersonal conflicts, need for reminders to perform daily tasks, anxiety attacks triggered by anger outbursts, periods of anhedonia, discomfort in crowded places, racing thoughts, and daily suicidal ideations. (Id. at 726-27.) She reported being able to perform basic acts of self-care independently, including waking up, bathing, dressing, grooming, driving, and managing her own funds. (Id. at 727.) She further reported having difficulty sleeping. (Id.)

According to Drs. Austin and Arroyo, Santiago presented as alert, casually dressed, and adequately groomed with adequate hygiene. (Id.) She was oriented as to person, place, and time, was cooperative, had adequate attention and concentration, and had adequate logical and coherent speech with adequate tone and volume. (Id.) Although no flight of ideas or loose associations were noted and no perceptional disturbances were reported, her mood was depressed with an irritable, flat affect and there was a mild impairment in recent and remote memory. (Id.)

Drs. Austin and Arroyo opined that Santiago's social functioning and functional abilities were limited based on her reports. (Id. at 727.) They diagnosed major depressive order (recurrent, moderate), anxiety disorder, and cannabis abuse in sustained remission. (Id.) They noted occupational problems and problems related to the social environment and gave her Global Assessment Functioning ("GAF") score of 53.[2] (Id. at 728.)

---

[2] The GAF Scale is a single measure used to track global, clinical progress of individuals. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed. 2000). The GAF Scale ranges from 1 to 100. Id. A GAF score from 51–60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Id. at 32. A GAF score from 41–50 indicates "serious symptoms . . . OR any serious impairment in social, occupational, or school functioning." Id. The American Psychiatric Association discontinued use of the GAF in the DSM-5. See Hall v. Colvin, 18 F. Supp. 3d 144, 153 (D.R.I. 2014).

### iii.     Erin Nuttall of Northeast Behavioral Health

On January 15, 2013, Santiago began treatment with therapist Erin Nuttall, M.A. (Id. at 874.) Santiago reported that she had been going through a difficult time since she became pregnant approximately five months prior to her appointment and subsequently lost her job after missing too many days while on bed rest. (Id.) Santiago also reported that she "over-worr[ied] about a lot of things" and felt sad or tearful every day. (Id.) She previously took Cymbalta and Wellbutrin, but was not on any medications at the time of the appointment. (Id. at 877.)

At that time, Santiago reported two arrests: one for armed robbery and one for assault and battery. (Id. at 875.) She also reported that she attended Katherine Gibbs College to become an administrative assistant and had studied psychology at Hesser College. (Id.) When asked if she wanted to work, Santiago stated "no." (Id. at 876.)

Nuttall found that Santiago's appearance was neat and appropriate and that her eye contact, build, posture, body movement, clothing, speech, emotional state-mood, emotional state-affect, facial expression, perception, thought content and process, intellectual functioning, orientation, memory, insight, and judgment were all within normal limits. (Id. at 878.) She described her behavior as relaxed and cooperative. (Id.) Santiago did not report any delusions or thoughts that were self-abusive, suicidal, or aggressive. (Id.) She did report difficulty controlling her anger, struggling with depression, and feeling stress because of family issues. (Id. at 879-80.)

Nuttall found no suicidal or homicidal ideation or self-destructive or aggressive thoughts or behavior and did not complete a safety plan with Santiago. (Id. at 869-70.) She noted that Santiago had a depressed affect and that Santiago denied current suicidal or homicidal ideations. (Id. at 873.) Nuttall diagnosed major depressive disorder and generalized anxiety disorder with a

GAF of 45. (Id. at 872, 882.) She noted that Santiago needed help managing her depression, anxiety, and anger. (Id. at 883.) She noted that Santiago would benefit from individual therapy as well as exploring psychopharmacology options for pregnant women. (Id. at 882-83.) She also suggested medication management treatment post-pregnancy. (Id.)

On January 25, 2013, Nuttall documented that Santiago reported feeling overwhelmed by demands her family placed on her, wanted to move out of her parents' house, and stated that her relationship with her boyfriend was turbulent, leading Nuttall to record her mental status as "appeared tired (emotionally and physically), sad, engaging." (Id. at 886.)

On February 11, 2013, Nuttall's notes state that Santiago had decided to move out of her parents' house and was living in her car because of home-related stress. (Id. at 887.) Nuttall described Santiago's mental status as "flat affect, appeared tired, engaging." (Id.) She noted that Santiago was not taking any medication. (Id.)

On February 12, 2013, Nuttall's notes state that Santiago's strengths included her intelligence, her ability to be proactive, and her regular attendance at appointments. (Id. at 884.) She reported that Santiago stated that she wanted to feel less depressed, feel good about herself, and decrease stress. (Id.) At that time, stated potential barriers to reaching her goals of managing stress and her depressed mood included being homeless, unemployed, and unable to take medication because of her pregnancy, as well as her lack of support from others. (Id.)

On February 19, 2013, Nuttall's treatment notes state that Santiago reported anxiety about a housing application and having had a difficult week because she discovered her boyfriend soliciting other women through social media, argued with her mother, and tried to go to a shelter but found it "disgusting." (Id. at 888.) Nuttall described Santiago's mental status as "frustrated, disappointed, engaging." (Id.)

On February 26, 2013, Nuttall documented that Santiago reported she was sleeping at her boyfriend's house and discovered additional evidence of his infidelity. (Id. at 889.) Nuttall described Santiago's mental status as "appeared tired, frustrated, discouraged." (Id.)

On March 5, 2013, Santiago reported some issues with her family, but she also noted that her relationship with her boyfriend had improved. (Id. at 890.) Nuttall described Santiago's mental status as "positive affect, engaging," and wrote that Santiago was considering moving to Florida once she obtained the disability benefits for which she had applied. (Id.)

On March 12, 2013, Santiago did not show up for her appointment. (Id. at 891.)

On March 21, 2013, Nuttall's notes state that Santiago was disappointed and worried about her social security disability application and feeling disgusted and frustrated with her boyfriend and her reliance on him. (Id. at 892.) Nuttall described Santiago's mental status as "appeared calm but expressed concern." (Id.)

On March 25, 2013, while Nuttall was still working with Santiago, Nuttall completed a Psychiatric/Psychological Impairment Questionnaire. (Id. at 855-62.) She diagnosed major depressive order and generalized anxiety order with a then-current GAF of 45. (Id. at 855.) Clinical findings included poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional lability, auditory and visual delusions or hallucinations, panic attacks about two times per month, anhedonia or pervasive loss of interests, psychomotor agitation, feelings of guilt or worthlessness, difficulty thinking or concentrating, pre-pregnancy suicidal ideation, time or place disorientation, social withdrawal or isolation, decreased energy, manic syndrome, intrusive recollections of a traumatic experience regarding a car accident, generalized persistent anxiety, somatization unexplained by organic disturbance, and hostility and irritability. (Id. at 855-56) Santiago's primary symptoms included anger issues, anxiety/panic, and

depression (including crying frequently, lacking motivation, socially isolated, difficulty sleeping, and feeling hopeless about the future) and her most frequent or most severe were her depressive symptoms (including lack of energy, inability to focus, and crying). (Id. at 857.)

In her responses in the questionnaire, Nuttall opined that Santiago was markedly limited in her ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual; to work in coordination with or proximity to others without being distracted by them; to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace; to accept instructions and respond appropriately to criticism from supervisors; and to get along with co-workers and peers. (Id. at 857-60.) Nuttall assessed Santiago as moderately limited in her ability to remember locations and work-like procedures; to understand, remember, and carry-out one or two-step instructions; to sustain ordinary routine without supervision; to make simple work-related decisions; to interact appropriately with the general public; to ask simple questions or request assistance; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently. (Id.) Nuttall also reported that Santiago was mildly limited in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Id.) There was no evidence of limitation in her ability to be aware of normal hazards and to take appropriate precautions and to travel to unfamiliar places or use public transportation. (Id.) Nuttall further noted that Santiago would decompensate at work if required to remain at work because she would become angry and, when faced with a stressful day, would "do anything" to be sent home. (Id. at 860.) She also noted that Santiago was incapable of even low stress as it causes her to become angry and aggressive. (Id. at 861.) She opined that Santiago had good days and bad

7

days and that she would likely miss about two to three days per month. (Id. at 861-62.) Additionally, Nuttall opined that Santiago's prognosis was fair with possible improvements in mood and ability to cope within approximately two years. (Id. at 855.)

On March 26, 2013, Santiago did not show up for her appointment. (Id. at 893.)

In a letter dated March 28, 2013, Nuttall wrote that Santiago had sought treatment because she reported struggling with depression, anxiety, and difficulty managing her anger. (Id. at 843.) Santiago reported having difficulty sleeping and feeling sad and tearful on a daily basis, hopelessness about the future, lack of interest, nervousness, heart pounding and racing, and constant worrying. (Id.) Santiago had weekly counseling utilizing cognitive behavioral therapy techniques but could not take medicine because she was pregnant. (Id.) Nuttall assigned her diagnoses of major depressive disorder and generalized anxiety disorder and noted that Santiago has a limited ability to manage her symptoms and hypothesized that her ability to cope would decrease based on the instability and lack of support systems then in her life. (Id. at 843-44.) Her prognosis was fair and possible improvements in mood and ability to manage her symptoms were not expected within two years of her March 2013 letter. (Id. at 844.)

On April 2, 2013, Nuttall's notes indicate that Santiago reported wanting to find part-time work and an apartment for herself. (Id. at 894.) Nuttall described her mental status as "flat affect, engaging." (Id.)

On April 9, 2013, Santiago again missed her appointment and was later transferred to a new therapist, Tammy Green, because Nuttall left the agency. (Id. at 895, 897.) Over the next series of appointments from April 25, 2013 through August 5, 2013, Green's notes focused on rapport building, and Santiago's adjustment to motherhood, lack of support from boyfriend, domestic violence issues, and her baby's health. (Id. at 897-909.) During that time, Green gave her

referrals to local agencies for baby supplies and a new mommy support group, provided support to her regarding whether to maintain a relationship with her boyfriend, and referred her to domestic violence resources. (Id.)

### iv. Eaton Medical Associates

Santiago began primary care treatment with Anthony G. Eaton, M.D. on April 11, 2013. (Id. at 845.) She sought follow-up for anxiety, depressive disorder, essential hypertension, and cystitis. (Id. at 845-46.) She reported then that her depression and anxiety were currently stable, and that her blood pressure had been controlled. (Id. at 845.) She reported suffering from depression and restless sleep. (Id. at 848.) She was thirty-four weeks pregnant at the time. (Id. at 847.) The examiner noted that she was oriented as to time, place, and person, and that her mental status was active and alert, but with a restricted affect. (Id. at 849.) The examiner also noted that Santiago had a counselor and a psychiatrist on board and that she was at high risk for post-partum depression. (Id.) She ultimately was diagnosed with hypercholesterolemia, scoliosis/back pain, allergic rhinitis, and anxiety/depression. (Id.)

In a letter dated August 13, 2013, Eaton reported that Santiago had "been following with" him for six months and that based upon a review of her past record, Santiago had a diagnosis of major depressive disorder. (Id. at 910.) He stated that her symptoms were still on-going and that she was taking medication and following at a behavioral health clinic. (Id.) He opined that her depression and anxiety would affect her ability to work. (Id.)

### v. Daniel R. Morocco, Ed.D.

On May 10, 2013, Dr. Daniel R. Morocco, Ed.D., P.C., evaluated Santiago. (Id. at 863.) He noted that she was completely cooperative, compliant, working to the best of her ability, motivated, and did not appear to become overwhelmed or defeated by failures. (Id. at 864.) She

9

was oriented to person, place and time, and was able to establish and maintain reasonable eye contact and at times initiated conversation. (Id.) Her expressive and receptive language functions were adequate and her attention, concentration, and frustration tolerances were unremarkable. (Id.) Her mood and affect were sullen and depressed. (Id.) She reported having nightmares, difficulty sleeping, and a variable appetite, as well as feeling depressed all of the time. (Id.)

Results of the Wechsler Adult Intelligence Scale-IV revealed a full-scale IQ score of 69 with composite scores ranging from low average to intellectually disabled. (Id.) Results from the Thematic Apperception Test revealed that Santiago presents as a morbidly depressed woman with a great deal of concern around social attachments. (Id. at 865.) Results of the Rorschach revealed that, while she prefers to rely on an intuitive, trial-and-error coping style, she is capable of paying attention to her mind as well as her instincts. (Id.) She is "sufficiently flexible to set her feeling aside and deal with experience in an ideational rather than an expressive manner," and consequently is "capable of recognizing and responding to her own feelings and the feelings of others." (Id.) Morocco noted that those who show such flexibility and stability in their coping styles, although not immune to psychological difficulties, "usually enjoy the benefits of being able to anticipate how they will respond to various experiences and of being seen by others as conducting themselves in a reasonably predicable and dependable manner." (Id.) He assigned a GAF score of 50. (Id. at 867.)

In sum, Morocco found that her intellectual abilities fell within the intellectually disabled (but not mentally retarded) range and that she had a significant cognitive disorder that affected her daily functioning, in addition to a morbid level of depression. (Id.) He diagnosed cognitive disorder (not otherwise specified) and major depressive order (continuous, severe, without psychotic features). (Id.)

B. <u>Relevant Testimony</u>

    i. *Santiago*

Santiago testified that she had been fired from "every single job." (Id. at 57.) In her previous position, she worked in customer service for approximately three to four months, answering phones, recording customers' information, and sending customers to the appropriate person for help. (Id. at 57-58.) Her supervisor terminated Santiago because Santiago missed too many days and did not interact well with the other coworkers and her supervisor felt it was not the best fit for Santiago. (Id. at 58.) She also testified she missed work approximately once per week because she "couldn't get out of bed" and was "really out of it, depressed, [with] crying spells." (Id.)

Santiago testified that she had previously worked in customer service for approximately one year performing the same kinds of tasks. (Id. at 59.) She stated that there were days she did not attend work because she "didn't feel like [herself]" and that she was terminated because the boss "didn't like how [she] was at work." (Id. at 60.) Santiago also testified that she previously worked as a cashier in retail for approximately three to four months and was "let go" after arguing with a coworker. (Id.) She also described a previous position taping boxes in a basement in which her boss felt she worked too slowly. (Id. at 62.)

When asked whether other positions might work better, Santiago demurred, stating the she has daily crying spells, feels miserable, can "pretend" to have good days but it would be "killing [her] inside." (Id. at 63.) She also testified about the various symptoms of her conditions as explained more fully in Section IV(C), *infra*.

Santiago also testified about her receipt of unemployment compensation. (Id. at 55-57.) She stated that she reported on a weekly or biweekly basis to the unemployment agency that she

was "ready, willing and able to work." (Id. at 56.) When the ALJ asked if she was ready, willing and able to work, she testified, "I'm not, but if I have to then I have to, because I have a newborn. I can't just not receive any type of income." (Id.) She admitted that she was not telling the truth to the unemployment agency, but that she was willing to try to work because she needed to support her child. (Id. at 57.)

> ii. Vocational Expert's Testimony

A vocational expert testified that, when considering an individual of Santiago's age, education, and work history, and with certain work-related limitations, such an individual could not perform Santiago's past work, but could work as a cleaner or collator operator. (Id. at 76-77.)

C. The ALJ's Decision

The Social Security Administration has promulgated a five-step sequential process for evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The agency must determine (1) whether the claimant is engaged in substantial gainful work activity; (2) whether the claimant has a "severe medically determinable physical or mental impairment" that also meets the duration requirements; (3) whether the claimant's impairment meets or medically equals an impairment listed under 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant has the residual functional capacity ("RFC") to continue her past work; and (5) whether the claimant's RFC would allow her to transition to other work, in light of her age, education, and work experience. Id.

In this case, at step one, the ALJ concluded that Santiago had not engaged in substantial gainful activity since March 18, 2011, her alleged disability onset date. (R. at 23.)

At step two, the ALJ found that Santiago had the following severe impairments: major depressive disorder, generalized anxiety disorder, cognitive disorder NOS, scoliosis, chronic

lumbar strain, condition status post left hand trauma, and obesity. (Id.) The ALJ found that Santiago's claimed diabetes mellitus, post-cholecystectomy condition, liver cysts, and headaches were non-severe. (Id. at 24.)

At step three, the ALJ concluded that Santiago's impairments did not meet or medically equal the severity of any of the impairments listed under 29 C.F.R. Part 404, Subpart P, Appendix 1. (Id.)

The ALJ went on to find that Santiago had the RFC to perform medium exertion work, as defined in 20 C.F.R.§ 404.1567(c), except that she could only frequently climb ramps, stairs, ladders, and scaffolds; frequently balance, crawl, kneel, and crouch; only occasionally stoop; only frequently finger and handle with the left non-dominant arm; perform routine tasks with no detailed instructions; perform goal-oriented, rather than production-pace work; sustain no more than occasional workplace changes; and tolerate no more than superficial interaction with the public, supervisors, or coworkers. (Id. at 26.)

At step four, the ALJ found that Santiago was not capable of performing her past relevant work. (Id. at 32-33.)

At step five, the ALJ found that Santiago could perform other jobs in the national economy, including as a cleaner or collator operator. (Id. at 33-34.)

Consequently, the ALJ found that Santiago was not disabled as defined in the Social Security Act from March 18, 2011 through the date of his decision. (Id. at 34.)

### III. Standard of Review

In reviewing a denial of social security disability benefits, "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); accord Manso-Pizarro v. Sec'y of Health & Human Servs., 76

F.3d 15, 16 (1st Cir. 1996). The Commissioner's decision is supported by substantial evidence "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (citation and internal quotations omitted). If supported by substantial evidence, the Commissioner's determination must be upheld "even if the record arguably could justify a different conclusion." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). Deciding upon issues of credibility is the "prime responsibility" of the ALJ. Rodriguez v. Celebrezze, 349 F.2d 494, 496 (1st Cir. 1965).

## IV. Discussion

On appeal, Santiago argues that the ALJ erred by: (1) finding that Santiago did not have an intellectual disability that met or medically equaled a listed impairment; (2) improperly weighing the opinion provided by Santiago's treating therapist, Erin Nuttall; and (3) improperly assessing Santiago's credibility.

### A. Finding Regarding Intellectual Ability

Santiago first contends that the ALJ erred by finding that she is not per se disabled under Section 12.05(C) of the Social Security Administration's Listing of Impairments. In order to satisfy Listing 12.05(C), a claimant must show that she (1) experiences "significantly subaverage general intellectual functioning with deficits in adaptive functioning [that] initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22;" (2) that she has a valid verbal, performance, or full scale IQ of 60 through 70; and (3) that she suffers from a "physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C). The ALJ

found that Santiago satisfied the last two elements, a valid IQ and an additional severe impairment, but not the first element, deficits in adaptive functioning.

Substantial evidence supports the ALJ's findings that Santiago did not establish deficits in adaptive functioning necessary and sufficient to demonstrate intellectual disability under the Listings. See Libby v. Astrue, 473 F. App'x 8, at *8 (1st Cir. 2012) (per curiam). Despite her mental limitations, she graduated high school and completed a two-year associate degree program in business science, albeit with various accommodations as a special education student. (R. at 54, 67-68.) She was able to work a number of different jobs, some for a substantial period of time. (Id. at 25-27, 390-94, 409-20.) There is evidence in the record that she provided for her own basic personal care and hygiene, managed her household by shopping, cooking, and driving, and managed her personal finances. (Id. at 592-93.) Similarly, she reported that she enjoyed watching television, reading, and writing poetry. (Id. at 592.)

On this evidence, the ALJ was justified in concluding that, even assuming that Santiago had suffered from an intellectual disability that had initially manifested itself before she was 22 years old and persisted to the present, she was not presently exhibiting "deficits in adaptive functioning" within the meaning of Listing 12.05(C). See Libby v. Astrue, No. 2:10-CV-292-JAW, 2011 WL 2940738, at *10 (D. Me. July 19, 2011), report and recommendation adopted, No. 2:10-CV-00292-JAW, 2011 WL 3715087 (D. Me. Aug. 24, 2011), aff'd, 473 F. App'x 8. Specifically, the ALJ supportably concluded that the evidence of Santiago's periods of substantial gainful activity in the more recent past "undermines the claimant's allegation that she suffers from ongoing deficits in adaptive functioning that initially manifested themselves prior to age 22." (R. at 25.) His conclusion that Santiago's reported activities of daily life were inconsistent with a finding of

deficits in adaptive functioning within the meaning of Listing 12.05(c) was supported by substantial evidence in the record.

Accordingly, there was no error.

### B. Weight of Medical Evidence

Santiago argues that the ALJ failed to properly weigh the medical evidence when he gave little weight to the opinions from Santiago's treating therapist, Erin Nuttall, and instead relied upon the opinions of the non-examining state agency medical consultants.

Under the relevant regulations, a therapist such as Nuttall is not among the recognized "acceptable medical sources." 20 C.F.R. § 404.1513(a). A therapist's opinion therefore is not afforded "controlling weight" under the treating physician's rule, but an ALJ has discretion to assign weight to a therapist's opinions as an "other source[]." See id. § 404.1513(d). Opinions of "other sources" such as therapists "may" be used "to show the severity of [the] impairment(s) and how it affects [the claimant's] ability to work. See id. "When deciding how much weight to give a therapist's opinion, an ALJ is only constrained by the duty to reach a conclusion supported by substantial evidence in the record." Gagnon v. Astrue, No. 11-CV-10381-PBS, 2012 WL 1065837, at *5 (D. Mass. Mar. 27, 2012) (citation omitted).

The ALJ's treatment of Nuttall's opinion is supported by substantial evidence. As he explained, he gave little weight to Nuttall's March 2013 opinion because that opinion was inconsistent with the overall weight of the record, including Nuttall's own therapy notes. For instance, Santiago told Nuttall in a therapy session that she was looking to obtain part-time work and move out on her own. (R. at 894.) Additionally, the ALJ noted that Nuttall's treatment notes tended to focus on situational stressors—such as her pregnancy, difficulty with her family and boyfriend, and her housing instability—as opposed to the alleged hallucinations, crying spells,

inability to leave her bed, or severe social dysfunction in a workplace setting noted in Nuttall's summary answers to the questionnaire. To the contrary, her initial treatment notes documented that Santiago's eye contact, build, posture, body movement, clothing, speech, emotional state-mood, emotional state-affect, facial expression, perception, thought process, intellectual functioning, orientation, memory, insight, and judgment were all within normal limits and that she was relaxed and cooperative. (Id. at 878.) At that time, Santiago reported feeling depressed, having difficulty controlling her anger, and feeling stressed because of her family, and she did not did not report any delusions or thoughts that were self-abusive, suicidal, or aggressive. (Id. at 878-80.) Similarly, later treatment document her mental status as appearing tired, sad, or flat, but also often engaging. (Id. at 886, 887, 890, 894.) Nuttall's notes also describe certain strengths, such as Santiago's intelligence, her ability to be proactive, and her regular attendance at appointments. (Id. at 884.)

With respect to the opinions of the non-examining state psychological consultants, Arthur Hamlin, Psy.D., and Anne-Marie Bercik, Ph.D., the ALJ did not err in affording them significant weight. See Martinez-Lopez v. Colvin, 54 F. Supp. 3d 122, 137 (D. Mass. 2014) (citations omitted). The consultants opined that Santiago could understand, retain, and carry-out simple instructions and perform routine tasks on a sustained basis with normal supervision, as well as cooperate effectively with the public and co-workers completing simple tasks and transactions. After consideration of the entire record, the ALJ found that the state consultants' assessments regarding Santiago's ability to maintain concentration, persistence, or pace were consistent with the weight of the evidence. Notably, he gave significant but not great weight to the consultants' opinion because he found that the claimant suffers from more severe social limitations than they opined. Substantial evidence supports the ALJ's decision.

### C. Assessment of Santiago's Credibility

Santiago complains that the ALJ erred in assessing her credibility, finding that while her "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible when evaluated in accordance with" the applicable regulations. (R. at 27.) As previously noted, credibility assessments are the "prime responsibility" of the ALJ. Rodriguez, 349 F.2d at 496. "The credibility determination by the ALJ, who observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).

Here, the ALJ had the opportunity to observe Santiago in person. He concluded that her statements about the intensity, persistence, and limiting effects of her symptoms were not consistent with the overall weight of the evidence. (R. at 28.) He supported his assessment with several specific findings.

First, he found that the claimant's work history was inconsistent with her alleged inability to hold any job for a substantial period of time because of alleged difficulties with social functioning, persistence, pace or concentration. He pointed to her earnings record and the fact that she held on to some jobs for one year or more as undermining her claims that she could not hold a job because of the severity of her mental impairments, including her alleged inability to maintain persistence or pace in a workplace setting or interact appropriately with others. He noted that while some evidence supported a finding that Santiago could not perform a job that requires significant social demands, such as customer service work, it did not show that she could not perform work in a lower stress, more isolated setting. He also doubted her claim that she could not maintain

18

appropriate pace in the workplace because she had been able to maintain some positions for at least a year.

Next, he relied on Santiago's statements at the hearing that she could work if necessary. Santiago testified that she was receiving unemployment benefits and reported to the unemployment agency that she is ready, willing, and able to work. She testified that this was not true, but that she would work if necessary to support her child. Further, the ALJ noted that Santiago had applied for customer service and cashier jobs, two positions she claimed she was incapable of performing.[3] The ALJ concluded that the "fact that the claimant herself testified that she would be able to work if she had to, combined with the fact that she is currently applying for jobs that require the performance of at least unskilled work with significant social interaction, undermines the credibility of the alleged frequency and intensity of her symptoms." (Id.)

The ALJ also relied upon Santiago's mental health treatment records, including at times little or sporadic treatment, her educational history, including her enrollment in college, and her desire to find her own apartment. While noting that Santiago received some accommodations in school, he found the fact that she was able to complete her associate degree in business science with a C average as probative evidence for a finding that she could at least perform unskilled work.

Further, the ALJ found little evidence in the medical records for Santiago's claimed hallucinations, panic attacks, crying spells that can last all day, or inability to get out of bed. In the treatment notes in evidence, mentions of these alleged impairments were limited compared with notes relating to depression, anxiety, or situational difficulties with her family, boyfriend, and even co-workers.

---

[3] Santiago also told Nuttall in April 2013 that she was looking for work. (Id. at 894.)

Despite Santiago's objections, it is within the ALJ's discretion to make an unfavorable credibility determination so long as he has considered the claimant's subjective complaints and sufficiently explained his reasons for rejecting them. Frustaglia, 829 F.2d at 195. The specific findings set out in the ALJ's decision—which are supported by the evidence in the case record—provide ample support for his credibility determination.

## V. Conclusion

For the reasons stated herein, the Santiago's Motion for Judgment on the Pleadings (dkt. no. 9) is DENIED and the Commissioner's Motion to Affirm the Commission's Decision (dkt. no. 14) is GRANTED. The ALJ's Decision is AFFIRMED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge